# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Crystal D. Kilcher, Daniel J. Kilcher,
Anthony C. Muellenberg, and
Anthony C. Muellenberg as Trustee of the
Troy D. Muellenberg 2007 Revocable
Trust,

**MEMORANDUM OPINION AND ORDER**

                    Plaintiffs,

Civil No. 12-1825 ADM/JJK

v.

Continental Casualty Company,

                    Defendant.

_____

Gordon P. Heinson, Esq., Kyle E. Hart, Esq., and Kristine Kroenke, Esq., Fabyanske, Westra, Hart & Thomson, PA, Minneapolis, MN, on behalf of Plaintiffs.

Andrew L. Margulis, Esq., Ropers, Majeski, Kohn & Bentley, PC, New York, NY; Charles E. Spevacek, Esq., and Tiffany M. Brown, Esq., Meagher & Geer, PLLP, Minneapolis, MN, on behalf of Defendant.

_____

## I.  INTRODUCTION

On March 6, 2013, the undersigned United States District Judge heard oral argument on Plaintiffs Crystal D. Kilcher, Daniel J. Kilcher, Anthony C. Muellenberg, and Anthony C. Muellenberg as Trustee of the Troy D. Muellenberg 2007 Revocable Trust's Motion for Summary Judgment [Docket No. 19].  The Court also heard argument on Defendant Continental Casualty Company's ("Continental") cross Motion for Summary Judgment [Docket No. 16]. The parties seek a declaratory judgment interpreting the terms of an insurance policy.  For the reasons set forth below, Plaintiffs' motion is granted, and Continental's motion is denied.

## II.  BACKGROUND

### A.  Plaintiffs' Investments

The facts giving rise to this action are largely undisputed.  Crystal Kilcher, Daniel

Kilcher, Anthony Muellenberg, and Troy Muellenberg[1] are children of Kimberly McKinley, and

all are members of the Shakopee Mdewakanton Sioux Community (the "Community").  Compl.

[Docket No. 1] ¶¶ 10-11.  Upon turning 18 years old, each member of the Community becomes

eligible to receive a share of the profits generated by the Community's gaming enterprises.

Margulis Aff. [Docket No. 13] Ex. D.

In 1988, Helen Dale, an investment broker later registered with Transamerica Financial

Advisors ("Transamerica"), sold the Community a group life insurance policy for a number of its

gaming employees.  Id. at Ex. B.  Dale continued to focus on soliciting business from the

Community as a whole, but by 1992 had also begun hosting monthly informational meetings at

the Community center to offer financial advice and sell insurance and investment products to

individual members.  Id.

In 1994, McKinley met Dale through a referral from McKinley's mother.  Id. at Ex. C.

After a meeting in McKinley's home, McKinley purchased life insurance and investment

products through Dale.  Id.  Believing Dale to be a trustworthy advisor, McKinley began

facilitating introductions between Dale and each of her children as they reached 18 years of age.

See id. at Ex. D.

In 1999, shortly after she became 18 years old, Crystal Kilcher began investing with

---

[1]  For ease of reference, the Court refers to this group as "Plaintiffs."  Troy Muellenberg died in 2009, and Anthony Muellenberg serves as trustee for Troy Muellenberg's revocable trust.  Pls.' Mem. Supp. Summ. J. [Docket No. 21] 11.

Dale.  Following Dale's advice, Crystal Kilcher purchased a $10 million life insurance policy

with a monthly premium of $5,000.  Hart Aff. [Docket No. 22] Ex. 9.  At the time of the

purchase, Crystal Kilcher did not have a spouse or dependents.  Id.  She also purchased

"hundreds of thousands of dollars'" of fixed annuities from various companies, the principals for

which she could not withdraw without penalty until she was 59 years old.  Id.  After Crystal

Kilcher married and had children, Dale recommended the purchase of two $1 million life

insurance policies, for each of her infant children.  Dale also recommended the purchase of two

additional life insurance policies for her husband, bringing his total life insurance to $4.25

million.  Id. at Ex. 1, ¶¶ 18-19; Pls.' Mem. Supp. Summ. J. 8.  Crystal Kilcher also purchased

supplemental income insurance from American Family Life Assurance Company of Columbus

("AFLAC"), although her income through the Community made the need for such insurance

questionable.  See Hart Aff. Ex. 13.  Crystal Kilcher did not discuss her investments, or Dale's

recommendations, with her mother or siblings.  See id. at Ex. 9.

     In 2000, after he turned 18, Daniel Kilcher also began investing through Dale.  Dale

encouraged Daniel Kilcher to purchase large insurance policies for himself and, later, for his

wife and child.  See id. at Ex. 1, ¶¶ 20-21; Ex. 10.  Daniel Kilcher also purchased riders for his

life insurance policy.  See id. at Exs. 1, 10.  On Dale's recommendation, Daniel Kilcher also

purchased fixed annuities.  Id. at Ex. 10.  In 2006, Dale sold Daniel Kilcher's annuity

investments while simultaneously purchasing more of the same type, which Daniel Kilcher now

believes was churning by Dale.  See Pls.' Mem. Supp. Summ. J. 9.[2]

---

[2]  Plaintiffs provide no citation to the record indicating which investments Dale sold and
then quickly re-purchased or when, but Continental does not dispute that it occurred.

In 2003, Anthony Muellenberg turned 18 and began investing through Dale.  Like Crystal and Daniel Kilcher, Dale advised Anthony Muellenberg to purchase a $10 million life insurance policy.  Id. at Ex. 11.  Anthony Muellenberg also purchased various annuities.  Id.  In addition, Dale asked Anthony Muellenberg to sign blank investment forms, so that Dale could later invest on Anthony Muellenberg's behalf.  Id.

Finally, Troy Muellenberg, Anthony Muellenberg's twin brother, also began investing with Dale in 2003.  Anthony and Troy Muellenberg met Dale at the same time, and like Anthony, Troy Muellenberg purchased at $10 million life insurance policy and various annuities.  See id. at Ex. 6.  Troy Muellenberg also purchased an AFLAC supplemental insurance policy through Dale.  See id.  Neither Anthony nor Troy Muellenberg had spouses or children during the relevant timeframe, and thus neither purchased additional life insurance through Dale.  See Pls.' Mem. Supp. Summ. J. 12.

In about May 2007, Plaintiffs met with a different investment advisor, who told them that their insurance and investments were inappropriate for their backgrounds and investment goals.  Margulis Aff. Ex. V, at 10-11 (citations omitted).  Plaintiffs each surrendered the insurance policies and investments they had made based on Dale's recommendations.  Id.  Based on an expert analysis, Plaintiffs claim combined losses well in excess of $2 million.  See Pls.' Mem. Supp. Summ. J. 14 (citing Hart Aff. Exs. 4-6).

**B.  Procedural History**

On December 11, 2007, each Plaintiff filed a separate statement of claim against Dale and her employer Transamerica with the Financial Industrial Regulatory Authority (FINRA).  Margulis Aff. Exs. F, AA, BB, CC.  In their respective arbitration proceedings, Plaintiffs alleged

Dale had violated her fiduciary duties to them, misrepresented the nature of recommended investments, sold unsuitable investments, and other related claims.  In April 2008, the parties agreed to consolidate their arbitration proceedings.  Id. at Ex. G.  After consolidation, the FINRA arbitrators granted Dale's and Transamerica's motion to dismiss certain claims.  Id. at Ex. I.  After this dismissal, Plaintiffs withdrew their claims from arbitration.  Id. at Ex. J.

Plaintiffs then each filed separate actions in the Hennepin County District Court.  Id. at Exs. K, EE, FF, GG.  Daniel Kilcher, Anthony Muellenberg, and Troy Muellenberg voluntarily dismissed their actions and consolidated their claims with Crystal Kilcher's claims through the filing of an amended complaint.  See id. at Ex. L.  The Hennepin County court dismissed several of Plaintiffs' claims with prejudice based on the prior FINRA arbitration ruling but also dismissed the remainder of Plaintiffs' claims without prejudice.  Id. at Ex. O.

In December 2009, Plaintiffs re-filed several claims in Minnesota state court, this time as a single action in the Scott County District Court.  Id. at Ex. E.  After two years of litigation, the Scott County court issued an order in which it concluded, in part, that Dale owed a fiduciary duty to Plaintiffs.  Hart Aff. Ex. 7.  The Scott County court did not reach the issue of whether Dale had breached her duty.  See id.

In May 2012, the parties reached a settlement.  Dale's errors and omissions insurance policy (the "Policy"), provided by Continental, allows for a maximum of $1 million in coverage per insurance claim, with an aggregate limit of $2 million.  Margulis Aff. Ex. P (the Policy).  As part of the settlement, Continental agreed to pay $1 million, the limit for a single claim.  Hart Aff. Ex. 2 ("Settlement Agreement").  After the defense's litigation costs, Continental's payment to Plaintiffs totaled about $525,000.  Id.  The parties could not agree whether Plaintiffs had

stated multiple, separate claims, and thus whether Continental was liable for the additional $1 million in coverage.  As part of the Settlement Agreement, the parties decided Plaintiffs would file a declaratory action against Continental for the sole purpose of determining whether Plaintiffs' claims arise from "Interrelated Wrongful Acts."  Id.  Continental agreed that if the court found Plaintiffs' claims did not arise from "Interrelated Wrongful Acts," the additional $1 million claims limit would apply.  Id.  In July 2012, Plaintiffs filed this action.  The parties do not seek a decision determining Plaintiffs' precise number of claims.

### III.  DISCUSSION

**A.  Standard of Review**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

The parties agree Minnesota law governs interpretation of the Policy.  See Nat'l Union Fire Ins. Co. of Pittsburgh v. Terra Indus., Inc., 346 F.3d 1160, 1164 (8th Cir. 2003) ("State law governs the interpretation of insurance policies.").  Under Minnesota law, the court interprets an insurance policy in keeping with the general principles of contract construction.  Progressive Specialty Ins. Co. v. Widness ex rel. Widness, 635 N.W.2d 516, 518 (Minn. 2001).  The parties also agree that interpreting an insurance policy and applying it to the facts of a case are questions of law.  See Am. Family Ins. Co. v. Walser, 628 N.W.2d 605, 609 (Minn. 2001).

When interpreting an insurance policy, the court should not focus on specific provisions

of the policy at the cost of losing sight of the whole document:

> The intent of the contracting parties is to be ascertained, not by a process of dissection in which words or phrases are isolated from their context, but rather from a process of synthesis in which the words and phrases are given a meaning in accordance with the obvious purpose of the insurance contract as a whole.

State Farm Mut. Auto. Ins. Co. v. Tennessee Farmers Mut. Ins. Co., 645 N.W.2d 169, 175

(Minn. Ct. App. 2002); see also Auto-Owners Ins. Co. v. Jensen, 667 F.2d 714, 719 (8th Cir.

1981).  If the policy is ambiguous in some respect, the ambiguous language must be construed in

favor of coverage.  See Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co., 383

N.W.2d 645, 652 (Minn. 1986).  If the policy is unambiguous, the policy must be given its plain

and ordinary meaning; the court should not "read an ambiguity into the plain language of an

insurance contract in order to construe it against the insurer."  Id.; see also Noran Neurological

Clinic, P.A. v. Travelers Indem. Co., 229 F.3d 707, 709 (8th Cir. 2000).

**B.  The Insurance Policy At Issue**

Dale received professional liability coverage under the Policy issued by Continental.  The

Policy provided Dale up to $1 million of coverage for a single "Claim," or $2 million in the

aggregate for multiple claims.  The Policy defines "Claim" as:

> a.  a written demand for monetary damages, or

> b.  a civil adjudicatory or arbitration proceeding for monetary damages,

> against an Insured for a Wrongful Act, including any appeal therefrom brought by or on behalf of or for the benefit of any Client.

Id. § II.5.  The Policy defines "Client" as "a natural person for whom, or entity for which,

Professional Services are rendered by an Insured."  Id. § II.6.

7

The Policy provides coverage for brokers against claims arising from negligence, errors or omissions, and other "Wrongful Acts." Id. § II.22. When a claimant states claims against a broker for such wrongful acts, it must then be determined whether the claims are related and should be treated as a single claim. Under the Policy, "[m]ore than one Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be considered as one Claim . . . ." Id. § V.8. The Policy defines Interrelated Wrongful Acts as "any Wrongful Acts which are logically or causally connected by reason of any common fact, circumstance, situation, transaction or event." Id. § II.9. Thus, if multiple claims are made under the Policy but each stems from the same Wrongful Act or from "Interrelated Wrongful Acts," the Policy offers a maximum of $1 million in coverage. If two or more claims are made but are not interrelated, the Policy provides an additional $1 million in coverage, for aggregate liability of $2 million.

**C. "Claim"**

As an initial matter, Continental argues the Court need not decide the interrelationships of the underlying wrongful acts because Plaintiffs have stated a single "Claim" as the Policy defines that term. Specifically, Continental argues a single "civil adjudicatory or arbitration proceeding" may only give rise to a single "Claim" under the Policy, and because Plaintiffs filed a single complaint in the Scott County action, they have necessarily stated a single "Claim." See Policy § II.5. Continental emphasizes that the Scott County action was settled at a single mediation, for a single settlement amount. Plaintiffs respond that the Policy language indicates separate "Clients" necessarily state separate "Claims," and that the only real issue is whether these claims derive from interrelated wrongful acts. In addition, Plaintiffs argue Continental's interpretation encourages needless claim-splitting. Although they offer differing interpretations,

the parties agree that the term "Claim," as defined by the Policy, is unambiguous.

Continental's offered interpretation confuses two distinct concepts. Under Continental's interpretation, a lawsuit and an insurance claim are identical. Courts interpreting similar insurance policies have justifiably held otherwise. See, e.g., Checkrite Ltd., Inc. v. Illinois Nat. Ins. Co., 95 F. Supp. 2d 180, 190-91 (S.D.N.Y. 2000). As the court in Checkrite held while interpreting comparable policy language, "some but not all claims are judicial proceedings and some but not all judicial proceedings are claims. These terms should not be conflated." Id. Instead, "the concept of 'claim' within the meaning of insurance policies is textual rather than procedural." Id. (quoting Home Ins. Co. of Ill. (N.H.) v. Spectrum Info. Techs., Inc., 930 F. Supp. 825, 847 (E.D.N.Y. 1996)); see also Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co., 855 P.2d 1263, 1270-75 (Cal. 1993) ("We agree . . . that including multiple claims within a single action does not render them a single claim."); Seneca Ins. Co. v. Kemper Ins. Co., No. 02 Civ. 10088(PKL), 2004 WL 1145830, at *7 (S.D.N.Y. May 21, 2004) ("The mere fact that claims are joined together in a suit does not establish a sufficient factual nexus between the claims."); AT&T Corp. v. Faraday Capital Ltd., 918 A.2d 1104, 1108-09 (Del. 2007); Brecek & Young Advisors, Inc. v. Lloyds of London Syndicate 2003, No. 09-2516-JAR, 2011 WL 1060955, at *8 (D. Kan. Mar. 21, 2011).

In this case, the term "Claim" is unambiguous and Plaintiffs have stated multiple claims. The Policy defines "Claim" as: (1) either a written demand, or a civil action or arbitration proceeding, (2) which is brought by or for the benefit of "any Client." Policy § II.5. The Policy defines "Client," in the singular, as a person or entity who received professional services from the insured. Id. § II.6. The plain language of these definitions requires that two "Clients" will

bring at least two "Claims."  The Policy never states, or even implies, that a group of clients

filing a single legal action have stated a single claim.

Continental's offered interpretation is also unreasonable because it encourages the filing

of unnecessary lawsuits, to the detriment of all involved parties.  Under Continental's view of

the Policy, claimants suffering injuries as the result of similar wrongful actions must still pursue

separate legal actions if they wish to state multiple insurance claims.  This legal posturing would

unnecessarily multiply litigation and waste the parties' and the court's resources.  See, e.g.,

Mosley v. Gen. Motors Corp., 497 F.2d 1330, 1332 (8th Cir. 1974) ("The purpose of the

[permissive joinder] rule is to promote trial convenience and expedite the final determination of

disputes, thereby preventing multiple lawsuits.").  Just as problematically, Continental's

interpretation of the Policy would discourage the subsequent consolidation of cases, joint

mediation, and global settlements.

In this case, Plaintiffs twice initiated separate legal proceedings, first in an arbitration

proceeding and then in Hennepin County, but later chose to consolidate their actions to increase

efficiency.  When the Hennepin County court dismissed Plaintiffs' claims, several without

prejudice, Plaintiffs decided to file a single action in Scott County.  Continental argues Plaintiffs

should have filed separate actions for a third time in Scott County if Plaintiffs truly wished to

state separate insurance claims, and that each Plaintiff should have conducted separate

negotiations resulting in separate settlements.  See Def.'s Mem. Opp. Summ. J. [Docket No. 26]

6-7; Def.'s Mem. Supp. Summ. J. [Docket No. 17] 30-31.  This needlessly inefficient outcome is

not suggested by either the letter or the spirit of the Policy.

**D.  Same "Wrongful Act"**

Continental briefly argues that Plaintiffs' claims stem from the same wrongful act, but its arguments are unpersuasive.  Multiple claims may only be treated as a single claim if: (1) the claims stem from a single Wrongful Act; or (2) the claims stem from more than one "Interrelated Wrongful Act."  See Policy § V.8.  In its memorandum supporting summary judgment, Continental rewrites the phrase "same Wrongful Act," stated in the singular, by arguing Plaintiffs' claims stem from the "same Wrongful Acts," a phrase written in the plural.  Def.'s Mem. Supp. Summ. J. 14.  This simple edit potentially, and unjustifiably, changes the meaning of the phrase and is thus rejected.  In its motion opposing Plaintiffs' motion for summary judgment, Continental also argues Plaintiffs' claims do in fact stem from a single wrongful act: the selling of $10 million life insurance policies.  Def.'s Mem. Supp. Summ. J. 13.  The selling of four separate life insurance policies, over a period of years, to four different people hardly constitutes a single act.  Additionally, Continental ignores that Plaintiffs' claims stem not only from the purchase of $10 million life insurance policies, but also from the purchase of various additional insurance policies, insurance riders, and annuity investments.

**E.  "Interrelated Wrongful Acts"**

The focus of the dispute between the parties is the term "Interrelated Wrongful Acts." First, Plaintiffs argue the term is ambiguous, meaning the Policy should be interpreted in favor of covering multiple claims.  Second, Continental argues that the definition of "Interrelated Wrongful Acts" is unambiguous, meaning the Policy broadly covers Plaintiff's multiple claims as interrelated.  Continental thus argues additional coverage is unwarranted.  Although the Court agrees the term is unambiguous, Plaintiffs' claims are not "Interrelated Wrongful Acts" as the

Policy defines that term.  In this case, Plaintiffs have parallel claims which do not necessarily connect with each other.  As discussed below, Plaintiffs have stated more than one insurance claim.

### 1.  Ambiguity

Plaintiffs argue the term "Interrelated Wrongful Acts," even as defined by the Policy, is ambiguous and cite several decisions in support.  As a result, Plaintiffs urge the Court to interpret the term in a way that favors coverage.  Continental argues Plaintiffs' cited decisions addressed policies that provided no further definition.

The term "Interrelated Wrongful Acts" is not ambiguous.  Continental is correct that many of the decisions cited by Plaintiffs are distinguishable.  See, e.g., McCuen v. Am. Cas. Co. of Reading, Pa., 946 F.2d 1401, 1407-08 (8th Cir. 1991) (finding the undefined word "interrelated" to be ambiguous); Sigma Fin. Corp. v. Am. Int'l Speciality Lines Ins. Co., 200 F. Supp. 2d 697, 706-07 (E.D. Mich. 2001), rev'd on other grounds, 200 F. Supp. 2d 710; Am. Home Assurance Co. v. Allen, 814 N.E.2d 662, 669 (Ind. Ct. App. 2004).  Where insurance policies have offered a definition, courts have been more willing to find the term unambiguous, and to apply it more broadly.  See, e.g., Stauth v. Nat'l Union Fire Ins. Co. of Pittsburgh, 185 F.3d 875, *9 (10th Cir. 1999) (unpublished); see also MF Nut Co., LLC v. Continental Cas. Co., No. 11-00004, 2013 WL 164425, *11-12 (D. Haw. 2013) (slip opinion) (collecting cases).

As discussed below, Plaintiffs' claims fall comfortably outside of the term "Interrelated Wrongful Acts."  As the Eighth Circuit Court of Appeals has held, "[c]ontext is often central to the way in which policy language is applied: the same language may be found both ambiguous and unambiguous as applied to different facts."  Highwoods Props., Inc. v. Exec. Risk Indem.,

Inc., 407 F.3d 917, 923 (8th Cir. 2005).  Citing a Seventh Circuit Court of Appeals decision, the

Eighth Circuit held terms such as "related," "interrelated," and "similar" could create substantial

ambiguity where the facts of a particular case did not "comfortably fit within the commonly

accepted definition of the concept."  Id. at 923-24 (citing Gregory v. Home Ins. Co., 876 F.2d

602, 606 (7th Cir. 1989)).  Given both the provided definition and the context of its use in this

case, the term "Interrelated Wrongful Acts" is unambiguous.

### 2. Logical or Causal Connection

Continental argues for an unjustifiably broad interpretation of the term "Interrelated

Wrongful Acts" and its definition.  Continental emphasizes the breadth of the term's definition

by arguing that if Plaintiffs' claims share "any common fact," they are necessarily interrelated.

See, e.g., Def.'s Mem. Opp. Summ. J. 14.  But this interpretation strips the Policy of key

relational language.  The Policy states Wrongful Acts are interrelated only when they are

"logically or casually connected by reason of any common fact . . . .   See Policy § II.9 (emphasis

added).  In other words, insurance claims are not interrelated simply because they share a

common fact; the claims must have a shared fact or circumstance that logically or causally ties

the claims to each other.  At the same time, this connection cannot so stretch the term "logically

or causally connected" that it renders the term meaningless or unreasonable.  See Bay Cities, 855

P.2d at 1275; see also Gregory, 876 F.2d at 606 ("At some point, of course, a logical connection

may be too tenuous reasonably to be called a relationship, and the rule of restrictive reading of

broad language would come into play.").

While Plaintiffs' claims have similarities, they exist in parallel and not in connection to

each other.  Plaintiffs each met with Dale separately over the course of about seven years.[3]  Each

Plaintiff formed a separate relationship with Dale.  None of the Plaintiffs invested together, and

Crystal Kilcher testified she did not even discuss the investments she made through Dale with

others.  See Hart Aff. Ex. 9.  Also, while some Plaintiffs invested in the same types of policies or

annuities, each invested for differing amounts and some purchased policies the others did not,

depending on their specific circumstances and interactions with Dale.  For example, Crystal

Kilcher purchased life insurance policies for her spouse and children, while Anthony and Troy

Muellenberg did not.  Unlike his siblings, Daniel Kilcher expressed a desire to withdraw from

his investments.  Dale sold some of his investments only to purchase additional ones.  See Hart

Aff. Ex. 1.  Daniel Kilcher thus pursued a churning claim while the other Plaintiffs did not.  Each

Plaintiff now argues, uncontested, that they suffered differing amounts in losses.  See Hart Aff.

Exs. 5-6.  And as Plaintiffs correctly argue, had they proceeded to trial each Plaintiff would have

needed to present his or her own evidence to carry their respective burdens of proof.  Because

most or all of Plaintiffs' claims do not share causal or logical connections, only similarities,

Plaintiffs have stated more than one insurance claim under the Policy.

Attempting to avoid this result, Continental relies heavily on two decisions: American

Commerce Ins. Brokers, Inc. v. Minnesota Mut. Fire & Cas. Co., 551 N.W.2d 224, 227-28

(Minn. 1996), and UnitedHealth Group Inc. v. Columbia Cas. Co., No. 05-CV-1289, 2010 WL

317521 (D. Minn. Jan. 19, 2010) (Schiltz, J.).  Contrary to Continental's arguments, however,

American Commerce supports a finding of multiple claims in this case, and the facts of

---

[3] It is unclear from the record whether Anthony Muellenberg and Troy Muellenberg met separately with Dale after their initial, joint meeting.  See Hart Aff. Ex. 11; Margulis Aff. Ex. D. Nevertheless, both individuals invested separately.

UnitedHealth are distinguishable.  The Court addresses each in turn.

In American Commerce, an employee embezzled about $190,000 from her employer through 155 individual acts.  Am. Commerce, 551 N.W.2d at 225-27.  The employer argued at least two but as many as 155 insurance claims existed as a result.  See id.  In determining whether the underlying acts formed "a series of related acts," and thus a single insurance claim, the Minnesota Supreme Court focused on several factors: "time, place, opportunity, pattern, and, most importantly, method or modus operandi."  Am. Commerce, 551 N.W.2d at 229-31.  Using these factors, the court held the minor variations between individual instances of embezzlement fell within two larger schemes: the writing of unauthorized payroll checks and the pocketing of insurance premiums intended for the employer.  See id.  As a result, the court found two separate "series of related acts" under the policy, and the employer received coverage for two claims.  Id.

American Commerce supports a finding of multiple claims in this case.  The court in American Commerce looked to the general methods used by an employee to achieve a single end, embezzlement, to the injury of a single insured, her employer.  Even then, the court recognized two different insurance claims based on the specific methods used by the employee.  Although American Commerce involved an occurrence-based policy with distinguishable policy language, this Court has previously looked to it for guidance when interpreting a claims-made policy with language resembling the Policy in this case.  See UnitedHealth, 2010 WL 317521, at *11.  Similarly, the Minnesota Supreme Court's decision is persuasive if not controlling here.  Dale's wrongful acts included selling unsuitable insurance policies but also unsuitable annuities; more broadly speaking, the wrongful acts claims involved selling unsuitable investments but also churning.  In either view, Plaintiffs have stated at least two separate claims under American

Commerce.

Continental's reliance on UnitedHealth is also misplaced.  In that case, plaintiff UnitedHealth sought coverage from defendant Columbia for litigation costs it incurred in defending an underlying case (the "McRaney case").  UnitedHealth, 2010 WL 317521, at *8-9. In the McRaney case, medical insurance claimants alleged a scheme to methodically deny medical insurance coverage based on financial criteria, as opposed to medical necessity.  Id. at *9-13.  Columbia argued that this underlying litigation related to other, earlier litigation (the "Shane case") Columbia had covered, meaning UnitedHealth had stated two claims arising from "a series of Wrongful Acts" and had already exhausted its insurance coverage.[4]  See id.  The court agreed, applying the American Commerce factors to determine that the two cases should be treated as one claim for insurance purposes.  Specifically, the court found UnitedHealth had used the same "methods or modus operandi"—namely, the same software and financial criteria—to systematically provide less coverage to medical insurance claimants, which resulted in injury to plaintiffs in both actions.  See id. at *9.

The claims before this Court are of a different quality altogether from the claims in UnitedHealth.  In UnitedHealth, the same central actions gave rise to multiple losses, meaning the claims arose from a single "series of Wrongful Acts."  Here, Plaintiffs each formed separate relationships with Dale resulting in separate injuries.  Dale did not plant a central scheme that branched out to entangle each Plaintiff, nor did any one of her actions give rise to all of

---

[4]   The policy at issue in that cased defined "a series of Wrongful Acts" as having "as a common nexus, any true facts, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes which shall constitute a single claim."  Id. at *10.

Plaintiffs' claims.  To find that Plaintiffs' claims are causally or logically connected only by reason of Dale's desire to generate commissions pushes the Policy's language to unreasonable extremes.[5]  Absent such broad generalizations, however, Continental cannot identify a single action, decision, or other fact that reasonably encompasses, connects, or gives rise to <u>all</u> of Plaintiffs' claims.

## F.  Continental's Preclusion Arguments

In addition to seeking summary judgment on the issues of contract interpretation above, Continental argues Plaintiffs' claims are precluded under three alternative doctrines.  Each is addressed briefly below.

### 1.  Collateral Estoppel

Continental argues the doctrine of collateral estoppel, or issue preclusion, prevents Plaintiffs from bringing this action because Plaintiffs have already taken the position, by virtue of their joint filings, that their claims arose from common facts.  Plaintiffs respond in two parts.  First, Plaintiffs argue Continental should itself be prevented from arguing preclusion because it agreed in the Settlement Agreement to allow this suit to reach the merits of the Complaint.  Second, Plaintiffs argue collateral estoppel does not apply because its requirements have not been met.

Continental's preclusion arguments do not succeed in this case.  Collateral estoppel has five elements:

---

[5]  Imagining Plaintiffs as persons unrelated by blood is a useful counterfactual.  If Plaintiffs were strangers to each other who met and began investing with Dale after seeing an advertisement, Continental would be hard pressed to establish "Interrelated Wrongful Acts."  Plaintiffs' shared background and their similar income levels do not justify lumping Plaintiffs together as part of a larger group incapable of asserting individual claims.

> (1) the party sought to be precluded in the second suit must have been a party, or in privity with a party, to the original lawsuit; (2) the issue sought to be precluded must be the same as the issue involved in the prior action; (3) the issue sought to be precluded must have been actually litigated in the prior action; (4) the issue sought to be precluded must have been determined by a valid and final judgment; and (5) the determination in the prior action must have been essential to the prior judgment.

Robinette v. Jones, 476 F.3d 585, 589 (8th Cir. 2007) (citation omitted).  In this case, none but the first element appears satisfied.  As discussed in Section III.C., above, the filing of joint legal claims, while potentially informative, is not determinative of whether the underlying insurance claims should be treated as interrelated.  As a result, Plaintiffs' filing of a joint complaint in any prior proceeding did not automatically determine the relationships between Plaintiffs' insurance claims.  And no arbitration panel or court has yet explicitly decided the issue of interpretation stated in the Complaint.  Finally, as Plaintiffs argue, their Settlement Agreement in the Scott County action cannot qualify as a final judgment because the parties explicitly left unresolved the question now before the Court.  See In re Estate of Bush, 224 N.W.2d 489, 500 (Minn. 1974); United States v. Brekke, 97 F.3d 1043, 1049 (8th Cir. 1996).  Continental's collateral estoppel argument is thus unpersuasive.

### 2.  Waiver

Using the same reasoning as above, Continental argues Plaintiffs waived their ability to pursue separate insurance claims by virtue of their decision to consolidate cases.  For the same reasons discussed above, this argument is rejected.  Continental has provided no other evidence that Plaintiffs knowingly and voluntarily waived their right to state multiple claims under the Policy, and the parties' Settlement Agreement states the opposite.  See Citizens Nat. Bank of Madelia v. Mankato Implement, Inc., 441 N.W.2d 483, 486-87 (Minn. 1989) (discussing

standards for waiver).

**3.  Laches**

Continental also argues Plaintiffs' claims are barred by laches, as Continental informed

Dale about five years ago that it viewed Plaintiffs' claims as arising from "Interrelated Wrongful

Acts" and Plaintiffs did not take an expressly contrary position until the Scott County action.

But Continental has not argued, let alone demonstrated, prejudice resulting from this supposed

delay.  See Goodman v. McDonnell Douglas Corp., 606 F.2d 800, 804 (8th Cir. 1979) ("For the

application of the doctrine of laches to bar a lawsuit, the plaintiff must be guilty of unreasonable

and inexcusable delay that has resulted in prejudice to the defendant.").

## IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

1.      Plaintiffs' Motion for Summary Judgment [Docket No. 19] is **GRANTED**.

2.      Defendant's Motion for Summary Judgment [Docket No. 16] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:

       s/Ann D. Montgomery      
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  April 1, 2013.